# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39781 (f rev)**

———————————

**UNITED STATES**
*Appellee*

v.

**Cion T. MONGE**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 5 July 2022

———————————

*Military Judge:* Rebecca E. Schmidt; Andrew R. Norton (remand).

*Sentence:* Sentence adjudged 20 July 2019 by GCM convened at Nellis Air Force Base, Nevada. Sentence entered by military judge on 12 August 2019 and reentered on 8 April 2021: Dishonorable discharge and hard labor without confinement for 60 days.

*For Appellant:* Major Mark J. Schwartz, USAF; Captain David L. Bosner, USAF.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Cortland T. Bobczynski, USAF; Major Brian E. Flanagan, USAF; Major Abbigayle C. Hunter, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, RAMÍREZ, and CADOTTE, *Appellate Military Judges.*

Judge RAMÍREZ delivered the opinion of the court, in which Chief Judge JOHNSON and Judge CADOTTE joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

RAMÍREZ, Judge:

A military judge found Appellant guilty, in accordance with his pleas, of one specification each of indecent visual recording and distribution of an indecent visual recording, both in violation of Article 120c, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920c;[1] and one specification each of wrongful possession and wrongful use (on divers occasions) of anabolic steroids, both in violation of Article 112a, UCMJ, 10 U.S.C. § 912a.[2]

Additionally, contrary to his pleas, a general court-martial composed of officer and enlisted members found Appellant guilty of one specification of sexual assault on divers occasions, in violation of Article 120, UCMJ, 10 U.S.C. § 920; and one specification of assault consummated by a battery,[3] in violation of Article 128, UCMJ, 10 U.S.C. § 928. The members sentenced Appellant to a dishonorable discharge and 60 days of hard labor without confinement.

Appellant's case is before us for a second time. In an earlier opinion, this court remanded the case to the Chief Trial Judge, Air Force Trial Judiciary, for corrective action, as we found that the convening authority erred by taking ambiguous and incomplete action on Appellant's sentence. *See United States v. Monge*, No. ACM 39781, 2021 CCA LEXIS 104, at *8 (A.F. Ct. Crim. App. 10 Mar. 2021) (unpub. op.). The convening authority subsequently approved Appellant's sentence, resulting in a new entry of judgment.

With this error having been corrected, we now turn to Appellant's two remaining issues on appeal: (1) whether the evidence was legally and factually sufficient to support his convictions for sexual assault and assault consummated by a battery; and (2) whether Appellant was deprived of his right to a unanimous verdict as guaranteed by the Sixth Amendment,[4] the Due Process

---

[1] All references in this opinion to the punitive articles of the UCMJ are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise noted, all other references to the UCMJ and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*).

[2] Appellant also pleaded not guilty to one specification of sexual assault in violation of Article 120, UCMJ, 10 U.S.C. § 920, and one specification of indecent broadcasting in violation of Article 120c, UCMJ, 10 U.S.C. § 920c. Both specifications were withdrawn and dismissed after arraignment but prior to the conclusion of Appellant's trial.

[3] Appellant was found guilty of the charge, and was found guilty of the specification, with exceptions. *See* R.C.M. 918(a)(1)(C).

[4] U.S. CONST. amend. VI.

Clause of the Fifth Amendment,[5] and the right to equal protection guaranteed by the Fifth Amendment.[6]

We find no material prejudice to a substantial right of Appellant and affirm the findings and sentence.

## I. BACKGROUND

In October 2017, RT, the victim in this case, was 21 years old. Her father was stationed in Yuma, Arizona. RT lived in Yuma and was attending cosmetology school.

Appellant joined the military in 2008, and in 2017, was stationed at Nellis Air Force Base (AFB), Nevada. He started dating KW in January 2017, and had been living with her since June 2017. In October 2017, Appellant was on temporary duty (TDY) in Yuma, Arizona.

RT and Appellant met on a dating application called Bumble in early October 2017. When RT contacted Appellant on Bumble, he told her that he was in the Air Force and in training for about three months at Yuma Proving Grounds. After messaging each other for approximately two weeks, the two decided to go on a date and ultimately did so on 19 October 2017. Appellant was staying in a hotel, and the plan was for the two of them to go to dinner and then go to Appellant's hotel for drinks. RT was not planning on spending the night with Appellant in his hotel room.

The evening started out as planned. RT met Appellant in the parking lot of Appellant's hotel between 1800 and 1830 hours and they walked to dinner. The two had food and drinks for approximately three hours, during which time RT consumed one or two alcoholic drinks. The two then walked to Appellant's hotel. Once in Appellant's hotel room, they opened a bottle of wine, sat on the couch, listened to music, and talked. During that time RT had one or two glasses of wine. At some point, while they were on the couch, they started kissing. In an effort to communicate to Appellant that she was not going to have sex with him, RT explained to Appellant that she was on her menstrual cycle.

RT then went to the bathroom. Upon returning from the bathroom, RT sat on the bed. Appellant joined her. RT explained that she "scooted [her]self" while on her back from the edge of the bed to the head of the bed and that they began to kiss again. Then, as they were kissing, Appellant pinned RT's arms down at the wrists. She felt as if she would not be able to get up and asked

---

[5] U.S. CONST. amend. V.

[6] With respect to Appellant's second issue, we granted Appellant's Motion for Leave to File a Supplemental Assignment of Error, which he raises pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

Appellant why he was doing that. Instead of answering her, Appellant began kissing her neck and began to remove her shorts. RT told Appellant to stop; he did not stop. She continued to tell him to stop and she tried to keep her shorts on. Appellant still did not stop. Appellant removed RT's shorts, then her underwear, and then her tampon. RT then explained, "[H]e had pinned my legs down in like the frog position, and he had his arms . . . on my legs."

RT told him, again, to stop. Appellant had RT's legs "pinned down in an open position" and then proceeded to perform oral sex on her. According to RT, Appellant was "[v]ery aggressive" while he performed oral sex on her. She explained:

> [H]e would have his arm, his hands on my legs, and it was to the point like because he's very strong, it's not like I could open or move my legs or anything, they were pinned down, and he would go and like he was getting very into it, he would kind of lift his hand and like slap his hand on my leg and then grasp it again. And it wasn't a complete slap because his hand didn't go back, he went back to grabbing and he was very aggressive whenever he was down there licking my vagina and everything. So, it wasn't enjoyable. It couldn't have been enjoyable when I didn't[7] want it and two, it was very, very aggressive.

Next, Appellant removed RT's shirt and bra. RT explained that she did not help him with their removal. Appellant also removed his shirt and pants. He used one hand to unbuckle his pants. Once RT's shirt and bra were removed, Appellant then "aggressively bit[ her] breasts." She described Appellant was also "sucking on them to the point where it was hurting and [she] was saying ow, this really hurts, stop, it hurts." RT was in shock and frozen. A few seconds later, Appellant penetrated RT's vagina with his penis.

When Appellant penetrated RT's vagina, it was painful for her. She tried to push him away by attempting to push her body up. She had her hands on his arms, trying to push. However, she was unsuccessful as he was stronger than her, so she "just laid there." This lasted approximately ten minutes until Appellant ejaculated. Appellant then got off of RT and grabbed his cell phone. RT tried to get up, but Appellant grabbed her by her shoulder and told her

---

[7] The trial transcript uses the word "did" instead of "didn't" and is attached to the record. *See* R.C.M. 1114(d). However, the audio recording of the testimony indicates that RT stated: "It couldn't have been enjoyable when I didn't want it and two, it was very, very aggressive." As we explained earlier in this opinion, references to the R.C.M. are to the 2019 *MCM*. Under these rules, a "substantially verbatim *recording*" of the proceedings is part of the record of trial. R.C.M. 1112(b)(1) (emphasis added). As such, we rely on the audio recording.

"no." She stayed on the bed and turned over, facing the wall. She could not fall asleep. She testified that she was thinking to herself: "I can't believe this just happened."

After several minutes of laying in that position, RT then turned so that her back was on the bed. Appellant turned on his side, facing her. He then slapped RT. She explained, "He was sitting, and he had his hand, and he forcefully hit my face with his hand. So, it was a slap and it had force[ ] to it." She felt pain and told Appellant: "Stop, don't slap me." However, Appellant slapped her in the face again and RT started crying. Appellant then said, "I'm sorry, I thought you meant you liked it." RT testified that she had "never felt so helpless and [had] never felt so weak" as when Appellant slapped her.

Appellant then started to kiss RT's face and she did not reciprocate. He then got on top of RT again and penetrated her vagina with his penis. When asked at trial whether she did or said anything to let Appellant know that she wanted to have sex, she testified that she said "no." She testified that she just laid there and that this occurrence only lasted a couple of minutes. Her memory was:

> He had a hard time staying hard, so he would, he was trying to get his penis hard again by touching it and everything, and even when it wasn't hard, he still put it in -- tried to force it inside me.

According to RT, Appellant then gave up further attempts to force his penis inside of her.

RT explained to the panel members that she did not believe yelling at Appellant, or being more forceful in telling him to stop, would have stopped him either time he penetrated her vagina with his penis.

RT explained that at that point, Appellant got up and went to the bathroom. She testified: "I was thinking when is he going to let me leave." While Appellant was in the bathroom, RT looked for her clothes, put them on, and told Appellant that she was leaving. She then went home, showered, and went to bed. However, she could not sleep. She explained that she could not sleep because she "was going over everything in [her] head, and [she] couldn't believe everything that had just happened and [she] was just sitting there thinking about everything." She was also sending text messages to her friends during that time, but not about the sexual assault.

RT's mother testified. She explained that when RT returned home that night, RT "went directly into the shower." RT's mother thought this was strange, because after going out at night, RT would typically wake up her parents, to tell them about her evening, before going to bed. RT's mother believed it was unusual that RT failed to do so on the night in question.

Although her mother was at home, RT did not immediately tell her what happened because she was embarrassed. She explained, "I was embarrassed and I really didn't know what to do, because I never thought this would actually happen to me." She continued, "I mean, you hear stories about it happening, but when it actually happens to you, it's . . . ." She did not continue that thought, but later provided:

> I've had sex before and I know what it's like to have consensual sex and I know what it's like to enjoy sex and I didn't enjoy it and I said no, and I was scared, and I was hurt. He was hurting me. I was, I said no, and no means no. No means stop. I was . . . I knew it wasn't right, whenever it happened, but I felt guilty, I felt embarrassed, I was trying to convince myself that this couldn't have happened to me. But I thought I was meeting a nice guy and everything was going well. And then I came home, and I never felt more disgusted. I felt dirty. I felt weak. It was the worst feeling I've ever felt.

The night that gave rise to the allegations in this case was a Thursday night leading into the early hours of Friday morning. That same Friday, RT noticed a bite mark on her neck and observed that her breasts "were very badly bruised." The next day, Saturday, RT showed her mother the bruising while RT was changing clothes for a charity event, and briefly told her mother what had happened to her. However, she did not go into details with her mother until that Monday. RT's mother testified that RT "had bruises everywhere but the most prominent ones" were "in the breast area." RT also sent Appellant a picture of the bruising on her breasts and told him that it was not normal.[8] Appellant responded by text saying that RT "got really into it." RT replied with "okay," and she "just left it at that."

Appellant and RT had planned to see each other that Saturday. Instead, however, RT went to a cancer awareness charity event with her mother—where she socialized with some of her friends. RT testified that Appellant was upset with her canceling. RT testified:

> He was upset that I didn't want to hang out with him, and I [sic] that I had posted on my snap story[9] of pictures with my old high

---

[8] The trial transcript uses the word "abnormal;" however, the audio recording of the testimony indicates that RT stated: "And I said, this isn't normal." Pursuant to R.C.M. 1112(b)(1), we utilize the audio recording.

[9] A "snap story" refers to a collection of Snapchat phone messages that play together in the order in which they were created.

school friends, because I went to high school in Yuma, and he responded like oh, this is why you didn't want to hang out with me, and he was sending me pretty aggressive texts, and he tried to FaceTime[10] me once or twice and I declined it.

After Appellant attempted to contact RT that evening, she "blocked" Appellant from being able to call or text her. She also deleted all communications on her phone between them. She explained that she did not "want to see anything that had to do with him."

RT's mother testified that at the charity event, there were various friends of RT's from high school. RT's mother further testified that instead of meeting up with those friends, RT stayed near her mother the entire night.

On the Monday following the assault and sexual assault, RT had a pre-scheduled doctor's appointment, but spoke with the doctor with regards to what had occurred with Appellant. Based on what she told the doctor, the doctor ordered a full medical screen for her. Part of the examination included swabbing RT's external genital area to collect a sample for DNA analysis. After the doctor's visit, RT reported the sexual assault to the police.

The Government called a DNA expert who testified that male DNA was found on the sample taken from RT's external genital area. The expert compared this DNA to Appellant's DNA and provided an expert opinion that "the source of the DNA from . . . the external genital swab could've come from the referenced [Appellant] or any of his paternally related relatives."

The police detective assigned to the case met with Appellant and retrieved a photograph from his phone, specifically, a nude picture of RT. RT did not know Appellant had taken the picture or that he had sent it to his friend along with a text stating that RT was "drunk and full of cum." Appellant's conduct led to the convictions for photographing and distributing the private area of RT, without her consent and under circumstances in which she had an expectation of privacy.

RT did not see Appellant again until the court-martial. Instead of staying in Yuma, Appellant's TDY was terminated early and he was sent back to Nellis AFB, where he was still living with KW. He told KW that he returned because law enforcement "had found his steroids." He did not tell KW about the sexual assault allegations regarding RT. KW did not find out about the sexual assault allegations until the Air Force Office of Special Investigations (AFOSI) informed her about the allegations. As described below, KW ultimately testified

---

[10] FaceTime is a video-phone product used on Apple products.

at Appellant's trial, pursuant to Mil. R. Evid. 413, regarding alleged incidents of nonconsensual sexual offenses committed by Appellant against KW.

At the court-martial, the panel members convicted Appellant of sexual assault and assault consummated by a battery.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of his convictions for sexual assault and assault consummated by a battery. He starts by arguing that RT's description of how Appellant sexually assaulted her was "perplexing," was "improbable," and "defies common sense." Appellant alleges that RT was telling "blatant lie[s]." He then claims that her in-court testimony was in conflict with what she told the sexual assault nurse examiner (SANE), a detective, and her mother. Appellant also argues that RT told her friends that a recent tattoo hurt but that her actions the night of the sexual assault were not consistent with her tattoo hurting—and claims this makes her unbelievable. As to the scientific evidence, Appellant asserts that "no determination could be made on whether any contact between Appellant and RT was nonconsensual based on looking analyzing [sic] the DNA evidence." Finally, Appellant contends that aside from RT not being believable, KW was not believable either. As discussed below, we disagree.

#### 1. Additional Background

The cross-examination of RT consisted mainly of questions designed to challenge her credibility—evidence of inconsistencies or of actions consistent with consent. For example, trial defense counsel asked, "Okay, so he was able to get his penis into your vagina without using his hand, despite you not want [sic] it there?" RT replied, "[H]e might have used his hand, I'm not completely sure." Trial defense counsel then asked why she did not put her legs back together once Appellant took his arms off of her legs. RT responded, "Because at that point, I didn't really know what to do." Furthermore, trial defense counsel asked, "So, he's in the bathroom with the door closed, you're fully dressed, you've been through this whole thing, and you don't leave?" RT responded, "No, I was in a state of shock. I did not know how to act."

Also, during cross-examination, RT testified that while she and Appellant were sitting on the couch and on the bed, the lights were on. During re-direct examination, RT testified that she believed the hotel room was lit with lamps and they were dimly lit, but that she could still see everything in the room. An expert called by trial defense counsel testified that the auto flash feature was enabled on Appellant's phone, that Appellant took a photograph at some point during the night, and that the flash was activated.

The SANE who examined RT also testified. The SANE documented 22 injuries to RT, with two of them being attributed to RT's dog. Aside from the injuries, the SANE testified as to what RT told her about the assault and sexual assault. The SANE's written report was not as detailed as RT's trial testimony.

Appellant also claims that inconsistencies between RT's testimony and that of her mother calls RT's credibility into question. Despite RT's mother testifying that RT was always within her vicinity during the Saturday charity event, cross-examination of RT's mother included text messages between RT and her mother, in which the mother was looking for RT during that event.

The DNA expert also confirmed that while the DNA swabs taken from RT's genital area were consistent with Appellant's DNA, there was another male's DNA present. However, the expert explained that the second DNA profile was so small that there was "insufficient DNA" to obtain results, and that "[t]here was not enough genetic information available in the profile that [the expert] developed to be able to make an inclusion or exclusion comparison for" that DNA profile.

Pursuant to Mil. R. Evid. 413, the Prosecution called KW as a witness for the purposes of providing the panel members evidence that Appellant committed uncharged sexual offenses as evidence of propensity to engage in sexual assault.

KW met Appellant at a CrossFit gym in October 2016. They soon started dating and moved in together. They stopped dating, and KW moved out, in November 2017, after AFOSI informed her about the allegations regarding RT.

KW testified that in early October 2017, while they were still dating and living together, Appellant went out drinking. When he got home, KW was woken up by Appellant kissing her and taking her clothes off. She told him "no" several times, and that she did not want to have sex. Appellant nonetheless took KW's clothes off and had sex with her, without her permission. She was on her back and Appellant was on top of her.

Shortly after this incident, Appellant went to Arizona where he had the encounter with RT that was the subject of his court-martial.

When Appellant returned from Arizona back to his duty station in Nevada, and while still living with KW, he had a house party. At the end of the night, KW went to bed. Appellant did not. However, at some point later that night, KW woke up to Appellant entering their bedroom. He undressed, got into bed, and then "started to stick his hands in [her] pants." KW told him that she did not want to do that and wanted to go to sleep. Appellant nonetheless took KW's pants off and had sex with KW without her consent. She told him "no" on more than one occasion.

When AFOSI first spoke with KW, she told them that Appellant had not sexually assaulted her. She testified that she was not truthful with AFOSI "[b]ecause she cared for him and [she] didn't want to do anything that would hurt him and [she] was embarrassed and scared." She also explained that Appellant had told her not to talk to AFOSI, that she was afraid of his physical strength, and that she was afraid of what he might do to her if she told AFOSI that he sexually assaulted her. In her words, she testified, she was "scared sh[**]less."

To put this evidence in context, the military judge instructed the panel members:

> You have heard testimony from [KW] that the accused may have sexually assaulted her on two occasions. The accused is not charged with these offenses. You may consider [KW]'s testimony for its tendency, if any, to show the accused's propensity to engage in the act alleged in Specification 1 of Charge I.[11]

> However, evidence of another sexual offense, on its own, is not sufficient to prove the accused guilty of a charged offense. You may not convict the accused solely because you believe he committed another sexual offense or offenses or solely because you believe the accused has a propensity to engage in sexual offenses. Bear in mind that the [G]overnment has the burden to prove beyond a reasonable doubt that the accused committed each of the elements of each charged offense.

As to consent relating to RT, the military judge instructed the panel members as to the definition of consent, as well as the defense of consent, as follows:

> The evidence has raised the issue of whether [RT] consented to the sexual conduct listed in Specification 1 of Charge I. All of the evidence concerning consent to the sexual conduct is relevant and must be considered in determining whether the [G]overnment has proven the elements of the offense. Stated another way, evidence the alleged victim consented to the sexual conduct, either alone or in conjunction with the other evidence in this case, may cause you to have a reasonable doubt as to whether the [G]overnment has proven every element of the offense.

---

[11] Specification 1 of Charge I is the sexual assault charge alleging that Appellant "commit[ted] a sexual act upon [RT], to wit: penetrating her vulva with his penis, by causing bodily harm to [RT], to wit: penetrating her vulva with his penis, without her consent."

The military judge also provided the following instruction regarding mistake of fact:

> The evidence has raised the issue of mistake of fact in relation to the offense of sexual assault, as alleged in Specification 1 of Charge I. There has been evidence tending to show that, at the time of the alleged offense, the accused mistakenly believed that [RT] consented to the sexual conduct alleged concerning this offense.

> Mistake of fact is a defense to [that] charged offense. "Mistake of fact" means that the accused held, as a result of ignorance or mistake, an incorrect belief that the other person consented to the sexual conduct.

> The ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances. To be reasonable, the ignorance or mistake must have been based on information, or lack of it, that would indicate to a reasonable person that the other person consented to the sexual conduct. Additionally, the ignorance or mistake cannot be based on the negligent failure to discover the true facts.

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted). As we resolve "questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. We take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

In order to find Appellant guilty of sexual assault, in violation of Article 120, UCMJ, as alleged in Specification 1 of Charge I, the panel members were required to find the following beyond a reasonable doubt: (1) that at or near

Yuma, Arizona, on divers occasions, on or about 19 October 2017, Appellant committed a sexual act upon RT, to wit: penetrating her vulva with his penis; and (2) that he did this by causing bodily harm to RT, to wit: penetrating her vulva with his penis, without her consent. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 45.b.(3)(b).

In order to find Appellant guilty of assault consummated by a battery, in violation of Article 128, UCMJ, as alleged in the Specification of Charge II, the panel members were required to find the following two elements beyond a reasonable doubt: (1) that at or near Yuma, Arizona, on or about 19 October 2017, Appellant did bodily harm to RT, to wit: by striking RT on her legs and face with his hands, removing RT's clothing with his hands, and biting RT on her breasts with his teeth; and (2) that the bodily harm was done with unlawful force or violence.[12] *See* 2016 *MCM*, pt. IV, ¶ 54.b.(2).

### 3. Analysis

As the incidents that give rise to the criminal allegations occurred as one course of conduct, we will address the sexual assault and assault consummated by a battery specifications together. Notably, Appellant does not allege a lack of evidence for purposes of the sufficiency of the evidence. Instead, he argues that the named victim, RT, cannot be believed, going so far as referring to some of her testimony as a "blatant lie." Appellant challenges RT's credibility and argues that the version of events described by RT was physically improbable. And because her testimony cannot be trusted, Appellant continues, the sexual assault and assault consummated by a battery specifications fail a sufficiency review. As outlined below, we disagree.

Considering the standard for legal sufficiency, based on RT's testimony, there was sufficient evidence before the fact-finder that Appellant had vaginal sex with RT, that it occurred twice in his hotel room in Yuma, Arizona, on or about 19 October 2017, that Appellant held her down against her will, that she told him "no," that Appellant penetrated RT's vulva with his penis without RT's consent, and that any mistake of fact was unreasonable. This is just as correct regarding RT's testimony concerning the assault consummated by a battery. RT testified that Appellant struck her legs, bit her breasts, that it hurt, that she cried, and that Appellant apologized. Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude

---

[12] The panel found Appellant guilty of Charge II. The Specification alleged that Appellant "did at or near Yuma, Arizona, on or about 19 October 2017, unlawfully strike [RT] on her legs and face with his hands, unlawfully remove [RT]'s clothing with his hands, and unlawfully bite [RT] on her breasts with his teeth." The panel found Appellant guilty with exceptions, specifically, by excepting the words "and face" and "unlawfully remove [RT's] clothing with his hands."

the evidence was legally sufficient to support Appellant's convictions, as to both specifications at issue, beyond a reasonable doubt.

As to factual sufficiency, we address each argument raised by Appellant and ask ourselves if we are convinced of Appellant's guilt beyond a reasonable doubt. These arguments include allegations that RT's testimony was partially contradicted by testimony given by a digital forensics expert, her mother, a law enforcement officer, and the SANE. Appellant also claims DNA evidence could not point to guilt, Snapchat messages call RT's veracity into question, and KW's testimony is unreliable.

Appellant first argues RT is not believable because she testified that the lights were on in Appellant's hotel room while she was being sexually assaulted. According to Appellant, a digital forensics expert contradicted RT's testimony, because Appellant took a cell phone picture of RT in the hotel room and his phone camera's flash automatically turned on. Appellant argues that the hotel room was "pitch black." Appellant twice uses this phrase in his brief, with no factual support in the trial transcript. Instead, the expert testified that "there's a sensor on the phone in the camera that reads the ambient lighting in the room and when it reaches a certain level of darkness, then it would automatically fire." However, the expert was clear that he was "not sure what the actual level would be," but noted "that's how the function operates." On the other hand, RT testified that she believed the hotel room did not have an overhead light, and that the room was lit with lamps. She explained that "[i]t was dim lighting, but you could still see everything." We find no meaningful contradiction between RT's testimony and the testimony given by the digital forensic expert.

Appellant next argues we should not believe RT because of alleged differences between her testimony and that of her mother. The first example of this alleged inconsistency is the timing of RT telling her mother about the sexual assault. On direct examination, RT testified that while she was changing to get ready for the charity event—which was on Saturday—she asked her mother to come into her room. She stated that her mother saw her injuries and asked how RT got them. RT testified that she told her mother she got them "[f]rom that night." She further testified that her mother asked whether RT had "wanted it," and that RT said she had not. RT finally explained that she did not provide any further details to her mother about the incident until Monday. During cross-examination, RT explained that she went straight home after the assaults and did not tell her mother what happened. She also testified, regarding whether she told her mother what had happened: "She saw my body, and I told her what happened." Trial defense counsel asked, "And that was on Friday," to which RT responded, "Yes." We find that the essence of RT's testimony was that she initially told her mother about the sexual assault—without going into detail—when her mother saw her injuries while RT was changing

clothing to go to the charity event. We do not find the distinction between days of the week critical to RT's believability as to the sexual assault or the assault consummated by a battery. As to the remaining issues Appellant raises regarding RT's mother's testimony, we similarly do not find that they cast doubt on RT's version of events.

Appellant also argues we should not believe RT because of alleged differences between her testimony and that of law enforcement witnesses. The first set of perceived inconsistencies centers around the timing of Appellant slapping RT and the timing of Appellant using the bathroom. We do not find these perceived inconsistencies critical, as they do not cast doubt as to their occurrence. Put another way, Appellant seems to accept that these factual assertions occurred, but claims that because the timing is different between RT's in-court testimony and hearsay testimony of a law enforcement officer, that we should believe that neither of these two versions occurred. We are not convinced. Additionally, the trial transcript does not support any specific timing conflict. The next set of perceived inconsistencies centers around some sort of alleged agreement between Appellant and RT that the injury to her breast was not abuse. According to Appellant, RT told the detective investigating the allegation that she and Appellant "agreed Appellant did not actually abuse her." This is problematic for two reasons. First, there is no support in the record for any such agreement. Second, RT was clear in her testimony that she sent Appellant a picture of the bruise on her breast, that Appellant responded by claiming that RT "got really into it," and she "just said okay, and then [she] just left it at that." The remainder of the perceived inconsistencies with the detective surround timing issues, double hearsay regarding what RT told the detective that she told her mother, and RT's desire not to report the incident. None of these arguments make RT less credible. They demonstrate that neither testimony nor memories are perfectly consistent.

Appellant further argues we should not believe RT because of two issues concerning the SANE. First, Appellant claims that RT did not tell the SANE everything that RT told the panel members. Put another way, RT was more specific in her testimony when compared to the SANE's written report. Second, Appellant argues the SANE could not tell how old the bruises on RT's body were, could not determine the source of the bruises, and could not testify as to whether the sex was consensual or non-consensual. As to the first issue—that RT did not tell the SANE everything that she told the panel—we again find this to be insufficient to cast doubt on RT's testimony. We attribute this to the information elicited during the examination being more abbreviated and for a different purpose than trial testimony. As to the second issue, we find this to be a product of the limits of what this type of examination can actually provide in many cases, rather than an issue of RT's testimony.

Appellant further argues we should not believe RT because—he claims—Snapchat messages and text messages, as well as photographs at the charity event, contradict her trial testimony. However, the photographs at issue depict RT at the charity event away from her mother—which contradicts the testimony of RT's mother's, not that of RT. As to the Snapchat messages, one set of them—sent late at night—actually supports her testimony that she could not sleep the night of the sexual assault. The other set of messages shows a sexual assault victim not wanting to participate in the judicial process, which we find under the circumstances does not impact the credibility of her testimony. Finally, there are messages about her recent back tattoo hurting. Appellant does not explain how this makes RT less credible.

Appellant also attacks the relevance of the DNA evidence. This argument is three-fold. First, Appellant claims that there were possibly two male contributors to the DNA found in a swab of RT's genital area. However, this argument carries little weight; Appellant's position at trial and on appeal is that the sex was consensual. Second, Appellant argues that the DNA could not distinguish between touching, sexual activity, or any other form of contact. Again, this argument is of little significance, given Appellant's argument that sex occurred, but was consensual. Third, Appellant argues that the DNA cannot prove that the contact was non-consensual. However, the Prosecution did not argue at trial that the DNA proved or even tended to show lack of consent.

Finally, Appellant challenges the factual sufficiency of his sexual assault and assault convictions by claiming KW was not credible. Appellant claims that she should not be believed because she initially told AFOSI that Appellant had not sexually assault her and waited until right before Appellant's court-martial to come forward. He also claims that when he and KW lived together, he was still married to someone else, and KW was angry because he had lied to her. Appellant also argues that KW was angry because the sexual assault allegations by RT happened while Appellant was still living with KW. Finally, according to Appellant, KW should also not be believed because he kept their dog after KW broke up with him, and this made her angry. We do not know—and need not determine—whether the members found KW's testimony credible. Appellant does not allege on appeal that the military judge abused her discretion in admitting KW's testimony. Regardless of how the members weighed KW's testimony, such a determination would not change our independent determination of the factual sufficiency of Appellant's convictions.

We have made allowances for not having personally observed the witnesses, we have weighed the evidence in the record of trial, we have considered the inconsistencies as pointed out by Appellant, and we are convinced of Appellant's guilt beyond a reasonable doubt. Accordingly, we find his convictions factually sufficient.

**B. Unanimous Verdict**

Appellant argues that he was deprived of his right to a unanimous verdict as guaranteed by the Sixth Amendment, the Due Process Clause of the Fifth Amendment, and the right to equal protection guaranteed by the Fifth Amendment. We have carefully considered this issue, and find it warrants neither further discussion nor relief. *See United States v. Anderson*, No. ACM 39969, 2022 CCA LEXIS 181, at \*50–57 (A.F. Ct. Crim. App. 25 Mar. 2022) (unpub. op.) (finding unanimous court-martial verdicts not required); *see also United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

16